Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VI

| SPECIAL CARE PHARMACY SERVICES, LLC; SPS PHARMACY SERVICES, INC.; ADVANCED HOME CARE SERVICES WEST, INC.; VISION INFUSION SERVICES, INC.; OPTIMA INFUSION PHARMACY, INC.; ELEVA RECOVERY, LLC H/N/C NOVA INFUSION<br><br>Recurridos<br><br>v.<br><br>ALIVIA INFUSION SERVICES, LLC METRO PAVIA AT HOME<br><br>Recurrente | KLRA202500173 | *REVISIÓN ADMINISTRATIVA* procedente del Departamento de Salud, Oficina de Asesoramiento Legal, División de Vistas Administrativas<br><br>Querella número: Q-24-04-010 (VLT)<br><br>Sobre: Práctica no autorizada servicios infusión; Violaciones Ley Núm. 2 de 1975, Reglamentos 9084 y 9321 |
| --- | --- | --- |

Panel integrado por su presidenta, la jueza Ortiz Flores, la juez Aldebol Mora y la jueza Boria Vizcarrondo.

Aldebol Mora, Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 26 de junio de 2025.

Comparece la parte recurrente, Alivia Infusion Services, LLC, mediante un recurso de revisión judicial, y nos solicita que revoquemos la determinación emitida por el Departamento de Salud el 14 de enero de 2025, notificada el 16 del mismo mes y año. Mediante el referido dictamen, la agencia, entre otras cosas, declaró Ha Lugar la *Querella*, en cuanto a lo relacionado con la prestación de servicios de infusión en el hogar, incoada por la parte recurrida, Special Care Pharmacy Services, LLC; SPS Specialty Pharmacy Services, Inc.; Advanced Home Care Services West, Inc.; Vision Infusion Services, Inc.; Óptima Infusion Pharmacy, Inc. y Eleva Recovery, LLC h/n/c/ Nova Infusion.

Por los fundamentos que expondremos a continuación, se confirma la determinación administrativa recurrida. Veamos.

**I**

El 16 de abril de 2024, Special Care Pharmacy Services, LLC; SPS Specialty Pharmacy Services, Inc.; Advanced Home Care Services West, Inc.; Vision Infusion Services, Inc.; Óptima Infusion Pharmacy, Inc. y Eleva Recovery, LLC h/n/c/ Nova Infusion (recurridos) radicaron una *Querella*,[1] posteriormente enmendada,[2] ante la División de Vistas Administrativas del Departamento de Salud, en contra de Alivia Infusion Services, LLC (Alivia o recurrente) y Metro Pavia at Home (Pavia). En síntesis, alegaron que Alivia brindada servicios de infusión en el hogar en las seis (6) regiones de salud establecidas por el Departamento de Salud, aun cuando no contaba con la licencia correspondiente y los Certificados de Necesidad y Conveniencia (CNCs) requeridos de toda entidad que proponga ofrecer servicios de salud en el hogar. Especificaron que Alivia ofrecía servicios de salud en el hogar mediante promoción y mercadeo de las terapias de infusión sin contar con el aval del Departamento de Salud, en contravención a las disposiciones establecidas en la *Ley de Certificados de Necesidad y Conveniencia*, Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, 24 LPRA sec. 334 *et seq.* (Ley Núm. 2-1975), el *Reglamento de Procedimientos Adjudicativos y de Reglamentación en el Departamento de Salud*, Reglamentos Núm. 9321 del 29 de octubre de 2021 (Reglamento Núm. 9321), y el *Reglamento del Secretario de Salud para Regir el Otorgamiento de Certificados de Necesidad y Conveniencia*, Reglamento Núm. 9084 del 17 de mayo de 2019 (Reglamento Núm. 9084).

Los recurridos arguyeron que Alivia había afirmado que, desde el año 2017, contaba con un contrato de servicios de enfermería con Pavia; entidad que estaba debidamente autorizada

---

[1] Apéndice del recurso, págs. 3-15.
[2] Íd., págs. 189-194.

para operar como agencia de salud en el hogar y que contaba con los CNCs correspondientes para ofrecer los servicios de infusión en el hogar en todas las regiones de salud. Según adujeron, a través de la alegada relación contractual entre Pavia y Alivia, esta última ofreció todos los servicios de infusión por conducto del personal adiestrado de Pavia, promovido como propios en distintas plataformas digitales. Alegaron que, a pesar de no contar con los CNCs, ni con las licencias operacionales correspondientes para proveer servicios de infusión en el hogar, Alivia mantenía contratos con diversas aseguradoras médicas, tanto para el despacho de medicamentos intravenosos, como para proveer los servicios de infusión en el hogar. Señalaron que Alivia, por conducto de su presidente, había admitido que ofrecieron servicios de infusión sin contar con el aval del Departamentos de Salud y los CNCs correspondientes que se les exigía obtener y mantener a todas las entidades que se propusieran a ofrecer servicios de infusión en el hogar. No obstante, plantearon que Alivia promocionaba, mercadeaba, firmaba contratos y brindaba servicios de infusión a través de su propio personal y de terceros por espacio de ocho (8) años sin contar con la autorización de la referida agencia estatal.

En cuanto a Pavia, los recurridos alegaron que esta había contratado indebidamente con Alivia para que esta última se valiera de su CNC y licencia operacional para brindar los servicios en cuestión, los cuales Alivia no estaba autorizada a ofrecer. Según indicaron, Pavia actuaba como agente, mandatario o representante de Alivia, quien ofrecía servicios de infusión en el hogar sin autorización para ello. En virtud de lo anterior, los recurridos solicitaron, en lo pertinente, el cese y desista de la práctica y representación ilegal de Alivia de ofrecer servicios de infusión en el hogar. A su vez, solicitaron la paralización de la consideración de las propuestas de CNC presentadas por Alivia ante la División de Vistas

Administrativas de la Secretaría Auxiliar para la Reglamentación y Acreditación de Facilidades de Salud (SARAFS) y la imposición de multas administrativas.

Por su parte, el 8 de mayo de 2024, Alivia instó una *Moción de Desestimación de [la] Querella,*[3] posteriormente enmendada.[4] En esencia, alegó que procedía la desestimación de la acción de epígrafe, toda vez que era improcedente como cuestión de derecho y no se justificaba la concesión de ninguno de los remedios solicitados por los recurridos. Negó proveer servicios de administración de medicamentos de infusión en el hogar sin CNCs expedidos por el Departamento de Salud. Sostuvo que trabajaba un modelo de servicios de salud junto a Pavia mediante el cual cada entidad llevaba a cabo las gestiones para las cuales estaba autorizada. Especificó que suplía y despachaba medicamentos, incluyendo intravenosos, según estaba autorizada a hacer, mientras que Pavia administraba los medicamentos de infusión en el hogar. Arguyó que la forma en la que gestionaba los servicios de salud con Pavia no estaba vedada por la Ley Núm. 2-1975, *supra,* ni por el Reglamento Núm. 9084, *supra.* Indicó que la legalidad de su modelo de servicios con Pavia había sido examinado por el Departamento de Salud en el año 2023 sin señalamiento alguno.

Por otro lado, Alivia argumentó en su petitorio que la acción de epígrafe era improcedente por constituir una interferencia indebida con el proceso de evaluación de sus CNCs, los cuales fueron iniciados con anterioridad al presente pleito, y se encontraban en curso. Según adujo, los recurridos habían expuesto los mismos argumentos y habían solicitado los mismos remedios previamente. Planteó que lo anterior constituía un abuso del derecho que denotaba una actuación *forum shopping* repudiada en

---

[3] Apéndice del recurso, págs. 83-97.
[4] Íd., págs. 471-487.

nuestra jurisdicción. Sostuvo que darle curso a la *Querella* radicada por los recurridos representaría una desviación crasa del proceso promulgado por el propio Departamento de Salud para la evaluación y concesión de CNCs, lo cual resultaría en una actuación *ultra vires* por parte del Departamento de Salud.

En desacuerdo, el 30 de mayo de 2024, los recurridos se opusieron.[5] Argumentaron que, de los anejos que acompañaban la *Querella* y de las propias admisiones de Alivia en su solicitud de desestimación, surgía que esta no se había limitado a brindar los servicios exclusivamente a través del personal de enfermería de Pavia. Indicaron que, en el portal de internet de Alivia, esta afirmaba que era una farmacia que no solo preparaba las infusiones recetadas para los pacientes, sino que contaba con una red de personal de enfermería que se encargaba de administrar la terapia, mediante aguja o catéter, y monitorear el tratamiento de los pacientes. Adujeron que, contrario a lo propuesto por Alivia, habían incoado la acción de epígrafe con el fin de que el Departamento de Salud pasara juicio sobre la conducta de Alivia, quien por admisiones propias se encontraba proveyendo servicios de infusión desde octubre de 2016, cuando ni existía el alegado contrato con Pavia. Explicaron que la razón de su acción en contra de Alivia era para cuestionar el modelo de negocios utilizado por esta última, quien había representado ofrecer servicios de infusión como si fuera una entidad autorizada para ello, valiéndose de terceros que actuaban como sus agentes o representantes. Plantearon que Alivia no había presentado copia de su presunto contrato con Pavia ni había evidenciado el alcance, los términos y las condiciones de dicho acuerdo, ni a través de qué autoridad había brindado servicios de infusión entre los meses de octubre de 2016 a febrero de 2017, cuando no existía contrato con

---

[5] Apéndice del recurso, págs. 280-298.

Pavia, pues Alivia había alegado que el acuerdo fue suscrito en febrero de 2017.

Además, los recurridos alegaron en su oposición que la existencia del mencionado contrato no eliminaba el hecho de que Alivia había representado ofrecer y activamente promovía servicios de infusión que brindaba sin encontrarse autorizada por el Departamento de Salud, en abierto desafío a las disposiciones establecidas en la Ley Núm. 2-1975, *supra*, y el Reglamento Núm. 9084, *supra*. Añadieron que Alivia había admitido que la razón por la cual había solicitado los CNCs fue por la cancelación del contrato que mantenía con las aseguradoras MCS Comercial y MCS Advantage, las cuales le requirieron que presentara los CNCs a su nombre que le autorizaban a ofrecer los servicios de infusión, como parte del proceso de revisión de sus credenciales.

Posteriormente, el 26 de junio de 2024, Alivia presentó su alegación responsiva.[6] En síntesis, negó las alegaciones en su contra y reiteró su solicitud de desestimación de la acción de epígrafe. Planteó que no existía disposición alguna en la Ley Núm. 2-1975, *supra*, ni en el Reglamento Núm. 9084, *supra*, que prohibiera el modelo de servicios de salud. Particularizó que dicho modelo de negocios era uno mediante el cual una entidad debidamente autorizada para el despacho de medicamentos intravenosos, como lo era ella, despachara dichos medicamentos, mientras que otra entidad, como Pavia, que contaban con los CNCs y licencia para ello, administrara los medicamentos de infusión en el hogar. Argumentó que los recurridos no citaban ninguna disposición legal que avalara el que un oficial examinador, en un procedimiento adjudicativo improcedente, paralizara la evaluación de otro oficial examinador que ya estaba trabajando previamente en el proceso de

---

[6] Apéndice del recurso, págs. 398-420.

consideración y evaluación de las propuestas de CNCs. Asimismo, reiteró su postura de que no procedía la acción de epígrafe ni los remedios solicitados por los recurridos.

El 2 de julio de 2024, Pavia presentó su *Contestación a [la] Querella Enmendada y Otros Extremos*, mediante la cual, entre otras cosas, solicitó que se aclarara su participación como parte indispensable y no como coquerellada.[7] En esencia, planteó que los recurridos hicieron una sola alegación en su contra, la cual negaba, aunque aceptó que tenía un contrato vigente con Alivia. No obstante, negó categóricamente cualquier alegación de participación en un esquema ilegal. Arguyó que la contratación que tenía con Alivia era consistente con el modelo de servicios de salud permitido por la reglamentación federal. Negó que actuara como agente, mandatario o representante de Alivia. Alegó que era quien ofrecía los servicios de infusión en el hogar, como proveedor autorizado para ello. Por otro lado, negó cualquier responsabilidad o conexión con violaciones o representaciones incorrectas atribuibles a Alivia.

A su vez, el 24 de julio de 2024, Pavia instó una *Solicitud de Desestimación*.[8] En síntesis, reiteró las posturas esbozadas en su alegación responsiva y argumentó que la *Querella* en cuestión no contenía alegaciones específicas en su contra que justificaran la concesión de un remedio a favor de los recurridos.

Luego de varios trámites procesales, y evaluadas las posturas de las partes, el 14 de enero de 2025, notificada el 16 del mismo mes y año,[9] el Secretario designado el Departamento de Salud emitió la *Resolución* que nos ocupa, mediante la cual declaró Ha Lugar la acción de epígrafe, en cuanto a lo relacionado con la prestación de servicios de infusión en el hogar.[10] Además, impuso una multa de

---

[7] Apéndice del recurso, págs. 452-458.
[8] Íd., págs. 623-640.
[9] Íd., págs. 938-940.
[10] Apéndice del recurso, págs. 941-943.

$30,000.00 en contra de Alivia y Pavia, respectivamente, a razón de $5,000.00 por ocurrencia o región. Asimismo, ordenó a Alivia y Pavia al cese y desista de la prestación de servicios de infusión en el hogar en todas las regiones, mediante su modelo de negocios. A su vez, declaró No Ha Lugar la querella enmendada en cuanto a la paralización de las solicitudes de CNC de Alivia en curso. La agencia concluyó que lo expuesto por el Oficial Examinador de la División de Vistas Administrativas era correcto, así como su análisis, por lo que acogió su recomendación.

En particular, en el *Informe del Oficial Examinador*, el Oficial Examinador recomendó la resolución sumaria del pleito al amparo de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, según permitido por la Regla 19 del Reglamento Núm. 9321, *supra*, por entender que no existían controversias de hechos. Además, desglosó las siguientes determinaciones de hechos:[11]

1. Durante el año 2023, Alivia presentó ante el Departamento de Salud ("Departamento") seis (6) solicitudes de CNC para programas de servicios de infusión con los números de propuesta: 23-06-013 (Región Este); 23-06-014 (Región Metropolitana); 23-06-015 (Región Noreste); 23-06-016 (Región Norte); 23-06-017 (Región Oeste); y 23-06-018 (Región Sur), en lo adelante denominadas conjuntamente "Solicitudes de CNC de Alivia".
2. Según informado en la vista argumentativa del 16 de julio de 2024, los procedimientos de Solicitudes de CNC de Alivia se encuentran siendo presididos por la Lcda. Verónica Jorge, Oficial Examinadora del Departamento.
3. Durante los meses de marzo y abril de 2024, se celebraron varias vistas públicas con respecto a las Solicitudes de CNC de Alivia.
4. Todas las querellantes participaron de las vistas públicas celebradas ante la Lcda. Jorge con relación a las Solicitudes de CNC de Alivia.
5. Todas las querellantes se opusieron a la concesión de los CNCs solicitados por Alivia.
6. Todas las querellantes comparecieron activamente durante el trámite administrativo de las vistas públicas celebradas en cada una de las propuestas de las Solicitudes de CNC de Alivia y presentaron prueba testifical, pericial y documental.

---

[11] Apéndice del recurso, págs. 944-972.

7. Las querellantes Special Care y Eleva Recovery presentaron ponencias escritas como parte de los procedimientos de Solicitudes de CNC de Alivia.

8. Durante las vistas públicas en los procedimientos de Solicitudes de CNC de Alivia, las querellantes solicitaron la paralización de la evaluación de tales solicitudes.

9. Específicamente Eleva Recovery solicitó al Departamento en su ponencia sobre la Propuesta Núm. 23-06-017 para establecer servicios de infusión en el hogar en la Región Oeste, que "no conceda el Certificado de Necesidad y Conveniencia [s]olicitado, incluyendo orden para que . . . se paren estos procedimientos hasta que el Departamento de Salud determine la Querella sometida por Special Care Pharmacy Services el 24 de febrero de 2023."

10. En su Moción de Desestimación de Querella, págs. 2, 10-11[,] Alivia menciona la "solicitud de querella" o "investigación" de Special Care fechada 23 de febrero de 2023 (Anejo 1). Independientemente de su interpretación sobre el Anejo B del 1 de marzo de 2023 que acompañó, afirma Alivia en su pág. 11 que "el asunto que motivó la investigación es exactamente el mismo que motiva esta Querella."

11. L(a)s Examinador(a)s a cargo de los procedimientos de Solicitudes de CNC de Alivia, no concedieron la solicitud para la paralización del proceso de evaluación de los CNCs.

12. Tanto a la fecha de la presentación de la Querella el 16 de abril de 2024, al 21 de agosto de 2024 como a la fecha de este Informe porque no se ha actualizado nada sobre el particular por las partes, se encuentran aún en curso los procedimientos en torno a las seis Solicitudes de CNC de Alivia.

13. En una ponencia escrita para la consideración de la propuesta de CNC Núm. 23-06-013 relacionada a la Región Este, se indica por la querellada que "Alivia Infusion Services cuenta con una amplia experiencia en el despacho de medicamentos intravenosos y la prestación de servicios de infusión intravenosa en el hogar en todas las regiones. Hemos tenido un historial exitoso de ofrecer atención segura y efectiva a pacientes en su entorno familiar desde que comenzamos a prestar los servicios en octubre de 2016".

14. En la pág. 9 de la ponencia escrita de Alivia antes mencionada (Anejo 3) se afirma: "Desde febrero de 2017, tenemos un contrato de servicios de enfermería con la compañía Metro Pav[i]a at Home que ofrece el servicio de infusión en el hogar para nuestros pacientes, que requieren este servicio."

15. "Según se desprende del Anejo 3, pág. 7, Alivia trabaja 'en colaboración con compañías que proveen servicios de enfermería y que administran las terapias de infusión en el hogar y los medicamentos que han sido recetados a nuestros pacientes'".

16. "[E]l contenido real, completo y con contexto de la ponencia de Alivia en relación con su propuesta de CNC para servicios de infusión se desprende de dicho documento".

17. "[E] testimonio del Sr. Sabnani fue consistente en las vistas públicas sobre las distintas propuestas de CNC de Alivia".

18. "Alivia Infusion contrata a Metro Pav[i]a at Home para que ofrezca servicios de infusión para los cuales Metro Pav[i]a at Home está debidamente licenciada y autorizada a brindar mediante un CNC. En dicho acuerdo se establece un proceso de coordinación donde Metro Pav[i]a at Home es quien brinda los servicios de infusión directamente a los pacientes."

19. El Subcontractor Agreement del 17 de febrero de 2017 en su pág. 2, inciso 3 incorpora un MSO Agreement "which shall be deemed the obligations of Contractor" y agrega: "Provider shall be deemed references to Contractor insofar as they relate or apply to home infusion services." El MSO indica a su vez:

   a) pág. 1, "PROVIDER shall arrange for the provision of Services to Beneficiaries of a Health Plan";
   b) pág. 5, en su Art. 1.26 Provider Services, entre otros, como aquellos "with respect to which PROVIDER has been credentialed in accordance with the terms of this Agreement, except as otherwise set forth I a subsequent Attachment or Plan Addendum";
   c) págs. 24-25, Art. 7.9 "shall apply with equal force to PROVIDER'S employees or independent contractors and PROVIDER agrees to assure such compliance"; y
   d) pág. 25, Art. 7.10 "shall be incorporated in its subcontracts and agrees to require such compliance."

20. En la pág. 1 (sin enumerar) del First Amended and Restated Subcontractor Agreement del 21 de septiembre de 2021, se dispone: "WHEREAS, Alivia and Contractor executed a Subcontractor Agreement dated as of February 17, 2017 (the 'Original Agreement'), and the parties desire to execute this Agreement to amend and restate the Original Agreement in its entirety."

21. El inciso 4 en la pág. 3 del First Amended and Restated Subcontractor Agreement del 21 de septiembre de 2021, dispone: "Alivia and Contractor agree that Alivia shall not have access to patient files or records for patients for whom drugs have not been dispensed by Alivia or for patients that are not receiving home infusion services under this Agreement."

22. En los incisos 6 y 7, págs. 3-4[,] del First Amended and Restated Subcontractor Agreement del 21 de septiembre de 2021 ambas partes se representan y aseguran una a la otra, en los respectivos subincisos (b):

   "performance of its Services required by this Agreement does not and shall not violate: (1) any applicable law, rule, or regulation"

"performance of its obligations required by this Agreement does not and shall not violate: (1) any applicable law, rule, or regulation"

23. En el inciso 15, pág. 8[,] del First Amended and Restated Subcontractor Agreement del 21 de septiembre de 2021 se dispone que la ley aplicable ("Governing Law") será la de Puerto Rico.
24. En su Moción de Desestimación de Querella, pág. 7[,] Alivia describe su modelo de negocios como uno en el cual "the nursing agency is an extension of the pharmacy, working as a subcontractor to provide the service."
25. En la misma ponencia de Alivia mencionada anteriormente, Anejo 3, pág. 8[,] se expresó: "Los cambios más recientes en el proceso de credencialización de los planes médicos, que nos requieren que Alivia Infusion Services tenga [s]us propios CNCs, nos obligan a modificar nuestro modelo de negocios actual donde subcontratamos todos los servicios de enfermería." (Énfasis y citas omitidas).

En cuanto al petitorio de paralización de las solicitudes de CNCs de Alivia, el Oficial Examinador indicó en el referido informe que ello era un ejercicio de discreción que se ejercía dentro del cause del procedimiento independiente de solicitudes de CNCs de Alivia, no en un procedimiento alterno y simultáneo como la *Querella* de epígrafe. Por otro lado, expresó que no había controversia en que, mediante el modelo de negocios de Alivia con Pavia, se proveían servicios de salud como los de un programa de servicios de infusión.

En virtud de lo anterior y luego de un análisis de la Ley Núm. 2-1975, *supra*, así como del Reglamento Núm. 9084, *supra*, el Oficial Examinador concluyó en su informe que Alivia y Pavia violentaron el inciso (2) del Artículo IV del Reglamento Núm. 9084, *supra*. Coligió que la prestación de servicios de infusión intravenosa en el hogar mediante el referido modelo de negocios equivalía a que Alivia proveyera servicios de infusión en el hogar por conducto de Pavia sin antes haber obtenido un CNC otorgado por el Secretario del Departamento de Salud, en contravención al citado articulado.

En desacuerdo, el 5 de febrero de 2025, Alivia y Pavia solicitaron reconsideración de la referida determinación,

respectivamente,[12] las cuales no fueron acogidas por la agencia en el término aplicable para ello.

Inconforme con la determinación de la agencia, el 24 de marzo de 2025, la parte recurrente compareció ante nos y señaló los siguientes errores:

> Erró el Departamento al emitir una Resolución por la vía sumaria en torno a los méritos de la Querella sin haberle dado a Alivia la oportunidad de un proceso plenario, en violación al debido proceso de ley.
>
> Erró el Departamento al no desestimar la Querella y, en vez, emitir una orden de cese y desista e imponer una multa contra Alivia, pues contrario a lo que concluye la Resolución, Alivia no estableció un "nuevo servicio de salud" ni una "nueva facilidad de salud".
>
> Erró el Departamento al penalizar a Alivia por utilizar un modelo de servicios que no está prohibido ni vedado en nuestro ordenamiento, siendo dicha determinación una actuación *ultra vires.*
>
> Erró el Departamento al actuar en contra de sus propios actos al no tomar en consideración que ya se había llevado a cabo una investigación en torno a las mismas supuestas violaciones y no hizo determinación alguna en contra de Alivia.
>
> Erró el Departamento al imponer multas improcedentes y excesivas.

En cumplimiento con nuestra *Resolución* del 26 de marzo de 2025, la parte recurrida compareció mediante *Alegato de la Parte Recurrida-Querellantes* el 23 de abril del año corriente. En respuesta, el 5 de mayo de 2025, la parte recurrente replicó. En desacuerdo, los recurridos duplicaron el 22 el mismo mes y año.

Por su parte, el Departamento de Salud compareció el 6 de mayo de 2025, a lo cual replicó la parte recurrente.

Con el beneficio de la comparecencia de las partes, así como con la copia certificada del expediente administrativo, nos disponemos a resolver el recurso que nos ocupa.

---

[12] Apéndice del recurso, págs. 973-994, 997-1012.

## II

### A

Sabido es que los tribunales apelativos debemos otorgar amplia deferencia a las decisiones emitidas por las agencias administrativas, puesto que estas cuentan con vasta experiencia y pericia para atender aquellos asuntos que se les han sido delegados por la Asamblea Legislativa. *Otero Rivera v. Bella Retail Group, Inc. y otros*, 2024 TSPR 70, resuelto el 24 de junio de 2024; *Hernández Feliciano v. Mun. Quebradillas*, 211 DPR 99 (2023); *OEG v. Martínez Giraud*, 210 DPR 79 (2022); *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018). Es por ello, que, tales determinaciones suponen una presunción de legalidad y corrección que a los tribunales nos corresponde respetar, mientras la parte que las impugne no presente prueba suficiente para derrotarlas. *Transporte Sonnell, LLC v. Junta de Subastas de la Autoridad de Carreteras y Transportación de Puerto Rico y otro*, 2024 TSPR 82, resuelto el 24 de julio de 2024; *Otero Rivera v. Bella Retail Group, Inc. y otros*, supra; *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 216 (2012). No obstante, tal norma no es absoluta. Es por ello que nuestro Máximo Foro ha enfatizado que no podemos imprimirle un sello de corrección, so pretexto de deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho. *Voilí Voilá Corp. et al. v. Mun. Guaynabo*, 213 DPR 753 (2023).

En *Torres Rivera v. Policía de PR*, 196 DPR 606, 628 (2016), nuestro Tribunal Supremo resumió las normas básicas en torno al alcance de la revisión judicial de la siguiente forma:

> [L]os tribunales deben deferencia a las decisiones de una agencia administrativa, pero ésta cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos

que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos, procede que se valide la interpretación que realizó la agencia administrativa recurrida. *Íd.* Véase, además, *Voilí Voilá Corp. et al. v. Mun. Guaynabo*, supra, y *Super Asphalt v. AFI y otro*, supra, pág. 819.

El criterio rector bajo el cual los tribunales deben revisar las decisiones administrativas es el criterio de razonabilidad. *OEG v. Martínez Giraud*, supra; *Super Asphalt v. AFI y otro*, supra, pág. 820; *Graciani Rodríguez v. Garaje Isla Verde*, supra, pág. 127; *Torres Rivera v. Policía de PR*, supra, pág. 626. Bajo este criterio, se limita la revisión judicial a dirimir si la agencia actuó de forma arbitraria o ilegal, o de manera tan irrazonable que su actuación constituya un abuso de discreción. *Íd.*

Bajo este supuesto, la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, 3 LPRA sec. 9675 (LPAU), estableció "el marco de revisión judicial de las determinaciones de las agencias administrativas". *Otero Rivera v. Bella Retail Group, Inc. y otros*, supra; *Rolón Martínez v. Supte. Policía*, supra, pág. 35. La intervención del tribunal se limita a tres áreas, a saber: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si las conclusiones de derecho del ente administrativo fueron correctas. *Katiria's Café, Inc. v. Municipio Autónomo de San Juan*, 2025 TSPR 33, resuelto el 27 de marzo de 2025, citando a *Pagán Santiago et al. v. ASR*, 185 DPR 341, 358 (2012); *Rolón Martínez v. Supte. Policía*, supra, págs. 35-36; *OEG v. Martínez Giraud*, supra; *Torres Rivera v. Policía de PR*, supra, págs. 626-627; *Batista, Nobbe v. Jta. Directores*,

supra, pág. 217. Nuestro Máximo Foro ha expresado que esta intervención "debe ocurrir cuando la decisión administrativa no se fundamente en evidencia sustancial o cuando la agencia se equivoque en la aplicación de la ley". *Rolón Martínez v. Supte. Policía*, supra, pág. 36. Siendo así, aquellas determinaciones de hechos formuladas por el ente administrativo deberán sostenerse cuando estén basadas en evidencia sustancial que surja del expediente administrativo considerado en su totalidad. *Íd.; OEG v. Martínez Giraud,* supra; *Super Asphalt v. AFI y otro,* supra.

Por otro lado, las determinaciones de derecho pueden ser revisadas en su totalidad. Sec. 4.5 de la LPAU, 3 LPRA sec. 9675; *Rolón Martínez v. Supte. Policía*, supra, pág. 36; *Torres Rivera v. Policía de PR*, supra, pág. 627. No obstante, los tribunales deberán darles peso y deferencia a las interpretaciones que la agencia realice de aquellas leyes particulares que administra. *Íd.*

El Tribunal Supremo de Puerto Rico ha dispuesto que la deferencia que le deben los tribunales a la interpretación que haga el ente administrativo sobre aquellas leyes y reglamentos que le corresponde poner en vigor, cede si la agencia: "(1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales". *Torres Rivera v. Policía de PR*, supra, págs. 627-628; *OEG v. Martínez Giraud*, supra. Finalmente, nuestra más Alta Curia ha expresado que, conforme a lo anterior, el criterio administrativo no podrá prevalecer en aquellas instancias donde la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrario al propósito para el cual fue aprobada la legislación y la política pública que promueve. Así, "la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que

conduzcan a la comisión de una injusticia". *OEG v. Martínez Giraud,* supra, pág. 11.

**B**

La *Ley de Certificados de Necesidad y Conveniencia,* Ley Núm. 2 del 7 de noviembre de 1975, según enmendada, 24 LPRA sec. 334 *et seq.* (Ley Núm. 2-1975), y el *Reglamento del Secretario de Salud para Regir el Otorgamiento de Certificados de Necesidad y Conveniencia,* Reglamento Núm. 9084 del 17 de mayo de 2019 (Reglamento Núm. 9084), rigen todo lo relacionado a la concesión o denegatoria de los Certificados de Necesidad y Conveniencia (CNCs). Surge de la Exposición de Motivos de la Ley Núm. 2-1975, *supra,* que la planificación ordenada de las facilidades y servicios de salud es indispensable para atender adecuadamente las necesidades de salud de la población, controlar los costos de los servicios de salud y velar porque estos se presten en aquellos núcleos poblacionales donde sean necesarios. Por lo cual, la Ley Núm. 2-1975, *supra,* autoriza al Secretario o a la Secretaria del Departamento de Salud a expedir certificados de necesidad y conveniencia a toda persona o entidad que, dentro del Estado Libre Asociado de Puerto Rico, proyecte adquirir o construir una facilidad de salud u ofrecer o desarrollar un nuevo servicio de salud. En virtud de ello, el precitado estatuto hace compulsorio el que toda persona o entidad que proyecte construir o adquirir una facilidad de salud u ofrecer o desarrollar un nuevo servicio de salud, solicite y obtenga a través del Secretario o la Secretaria del Departamento de Salud un certificado de necesidad y conveniencia.[13]

---

[13] El Artículo 1 de la Ley Núm. 2-1975, 24 LPRA sec. 334, define *Certificado de Necesidad y Conveniencia* como un documento emitido por el Secretario o la Secretaria del Departamento de Salud autorizando a una persona a llevar a cabo cualquiera de las actividades cubiertas por este estatuto, certificando que la misma es necesaria para la población que va a servir y que no afectará indebidamente los servicios existentes, contribuyendo así al desarrollo ordenado y adecuado de los servicios de salud en Puerto Rico.

El Departamento de Salud es el organismo creado por ley para proteger los intereses y el bienestar de la ciudadanía en el área de la salud. Cónsono con ello, el Artículo 22 de la Ley Núm. 2-1975, 24 LPRA sec. 334j, establece que el Secretario o la Secretaria del Departamento de Salud promulgará un reglamento que tendrá fuerza de ley para establecer todo lo relacionado con las solicitudes de certificado de necesidad y conveniencia. Además, dispone que se establecerán las normas que aseguren que la información que se requiera a las personas solicitantes sea aquella necesaria y pertinente para evaluación de la solicitud. En virtud de ello, promulgaron el Reglamento Núm. 9084, *supra*.

En lo aquí atinente, el Artículo IV del Reglamento Núm. 9084, *supra*, establece que ninguna persona podrá efectuar, directamente o por conducto de un agente, mandatario o representante, cualquiera de las actividades enumeradas a continuación sin antes haber obtenido un CNC otorgado por el Secretario o la Secretaria del Departamento de Salud. En específico, se requerirá un CNC para las siguientes actividades:

1. La Adquisición de una Facilidad de Salud existente. Aplica a la Adquisición de una Facilidad de Salud mediante donación, arrendamiento, compraventa o de cualquier otro modo.
2. El establecimiento de una Nueva Facilidad de Salud, independientemente al monto de la Inversión de Capital requerida.
3. La Inversión de Capital hecha por, o a favor de una Facilidad de Salud existente por la cantidad de dos millones de dólares ($2,000,000) o más, cuantía que incluye los costos de todo estudio, plano, especificaciones y actividades relacionadas. El límite de cuantía mencionada no aplica cuando la Facilidad de Salud sea un Banco de Sangre o un Laboratorio Clínico, que siempre requerirán el otorgamiento de un CNC.
4. Todo aumento al número de camas autorizadas de un Hospital.
5. Toda redistribución de camas entre categorías para un Hospital, aunque no se altere la cantidad total de camas autorizadas.
6. Toda relocalización de camas de una Facilidad de Salud a otra.

7. La terminación de un Servicio de Salud que se ha estado ofreciendo por, o a través de, una Facilidad de Salud.

8. Añadir un nuevo Servicio de Salud por, o a favor de una Facilidad de Salud, que conlleve gastos operacionales de ochocientos mil dólares ($800,000) o más. El límite de cuantía mencionada no aplica cuando la Facilidad de Salud sea un Banco de Sangre o un Laboratorio Clínico, que siempre requerirán el otorgamiento de un CNC.

9. La Adquisición por cualquier Persona o Facilidad de Salud de un Equipo Médico Altamente Especializado con un costo igual o mayor a un millón de dólares ($1,000,000) y que será propiedad de, o estará ubicado en, una Facilidad de Salud. En la determinación del costo se incluirá el costo de los estudios, planos, especificaciones, arbitrios y de toda la actividad esencial relacionada a la Adquisición del equipo.

10. La Adquisición por cualquier Persona de un Equipo Médico Altamente Especializado de cualquier costo que no será propiedad de, ni estará localizado en, una Facilidad de Salud y que será utilizado por pacientes hospitalizados. Si el equipo no será utilizado por pacientes hospitalizados ni será propiedad de, ni estará localizado en una facilidad de salud, el adquirente deberá notificar, por escrito, al Secretario [o Secretaria] su intención de adquirir dicho equipo y el uso al que habrá de destinarlo, dentro de un periodo no mayor de treinta (30) días antes de fecha en que habrá de formalizar la adquisición.

11. Realizar una Relocalización de una Facilidad de Salud.

12. Efectuar el cierre de una Facilidad de Salud, ya sea un Cierre Temporal, Cierre por Emergencia o Cierre Permanente conforme a los parámetros establecidos en este Reglamento.

13. Reabrir una Facilidad de Salud luego de un Cierre Temporal o Cierre por Emergencia.

14. Realizar un cambio al CNC vigente de una Facilidad de Salud para modificar el nombre de la Persona que aparece como administrador en el certificado.

15. Realizar un cambio a un CNC vigente de una Facilidad de Salud para modificar el nombre de la Persona que aparece como dueño en el certificado.

16. Realizar un cambio al CNC vigente de una Facilidad de Salud para Cambiar o Consignar la Dirección que aparece en el certificado.

17. Ampliar a Regiones de Salud adicionales los Servicios de Salud ofrecidos por los Programas de Servicios de Salud en el Hogar, Programas de Hospicios y/o Programas de Servicios de Infusión con al menos un (1) CNC vigente.

18. Autorizar una Unidad Móvil para una Facilidad de Salud previamente autorizada mediante CNC.

De igual forma, el Artículo III del Reglamento Núm. 9084, *supra*, define los siguientes conceptos pertinentes a la controversia que nos compete:

[…]

26. <u>Facilidad de Salud</u> – Se refiere a toda facilidad que provea Servicios de Salud, incluyendo, entre otros, Hospitales, Programas de Hospicios, Facilidades de Cuidado Extendido, Casas de Salud, Programas de Salud en el Hogar, Centros de Rehabilitación, Centros de Diálisis Renales, Centros de Cirugía Ambulatoria, Centros de Diagnóstico y Tratamiento, Bancos de Sangre, Laboratorios Clínicos y Facilidades Radiológicas, según definido en la Ley de CNC y este Reglamento.

[…]

49. <u>Programa de Servicios de Salud en el Hogar</u> – Se refiere a un programa que provee servicios diestros de enfermería y otros servicios terapéuticos y de soporte a pacientes con condiciones agudas, crónicas y/o terminales, en el escenario de su hogar, o en una ubicación sustituta comparable.

[…]

57. <u>Servicios de Salud</u> – Se refiere a todo servicio que se preste en o a través de una Facilidad de Salud con aspectos clínicos, de diagnóstico, de tratamiento o de rehabilitación, incluyendo servicios relacionados con el tratamiento de condiciones de alcoholismo, adicción a drogas y/o salud mental.

[…]

Por otro lado, el Artículo XIV del Reglamento Núm. 9084, *supra*, dispone que el Departamento de Salud podrá imponer multas administrativas que no excederán de cinco mil dólares ($5,000) por ocurrencia, por cada violación de alguna disposición de la Ley Núm. 2-1975, *supra*, o del precitado cuerpo reglamentario.

**C**

Sobre la disposición sumaria de las controversias presentadas en las agencias administrativas, la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, según enmendada, 3 LPRA sec. 9601 *et seq.* (LPAU), establece un cuerpo de reglas mínimas que provee uniformidad al

procedimiento decisional de las agencias públicas en nuestra jurisdicción con el propósito de alentar la solución informal de las controversias administrativas. *Torres Santiago v. Depto. Justicia*, 181 DPR 969, 991 (2011). Dicho estatuto, además, faculta a las entidades administrativas a disponer de los asuntos ante su consideración mediante resolución sumaria, salvo que la ley orgánica de la agencia disponga lo contrario. *OCS v. Universal*, 187 DPR 164, 177 (2012); *Torres Santiago v. Depto. Justicia*, supra. En particular, el inciso (b) de la Sección 3.7 de la LPAU, 3 LPRA sec. 9647(b), dispone que:

> [...]
>
> (b) Si la agencia determina a solicitud de alguna de las partes y luego de analizar los documentos que acompañan la solicitud de orden o resolución sumaria y los documentos incluidos con la moción en oposición, así como aqu[e]llos que obren en el expediente de la agencia, que no es necesario celebrar una vista adjudicativa, podrá dictar órdenes o resoluciones sumarias, ya sean de carácter final, o parcial resolviendo cualquier controversia entre las partes, que sean separable de las controversias, excepto en aquellos casos donde la ley orgánica de la agencia disponga lo contrario.
>
> La agencia no podrá dictar órdenes o resoluciones sumarias en los casos en que (1) existen hechos materiales o esenciales controvertidos; (2) hay alegaciones afirmativas en la querella que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la petición una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derechos no procede.

A través de la resolución sumaria se puede aligerar "el proceso adjudicativo en casos en que no estén presentes los hechos materiales en controversia". *OCS v. Universal*, supra. En ese sentido, nada impide que una agencia pueda adjudicar sin celebrar una vista evidenciaria cuando no exista controversia sobre los hechos y, además, toda la evidencia documental que surge del expediente

señale claramente la corrección de la determinación de la agencia. *Íd.*, pág. 178.

Cónsono con lo anterior, y atinente a la controversia de autos, la Regla 28 del *Reglamento de Procedimientos Adjudicativos y de Reglamentación en el Departamento de Salud*, Reglamentos Núm. 9321 del 29 de octubre de 2021 (Reglamento Núm. 9321), establece que el Oficial Examinador podrá recomendar la desestimación de una querella en la cual no se justifique la concesión de un remedio o por cualquier otro fundamento que proceda en derecho. De otro lado, la Regla 19 del mismo cuerpo reglamentario dispone que los principios fundamentales de las Reglas de Procedimiento Civil y de Evidencia se aplicarán de manera supletoria para lograr una solución rápida, justa y económica del procedimiento y en la medida en que la persona funcionaria que preside la vista lo estime necesario para llevar a cabo los fines de la justicia.

A tales efectos, la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2, estatuye que, si en una moción en que se formula la defensa de que las alegaciones dejan de exponer una reclamación que justifique la concesión de un remedio, se exponen materias no contenidas en la alegación impugnada, y estas no son excluidas por el tribunal, la moción deberá ser considerada como una solicitud de sentencia sumaria. Por lo tanto, dicho petitorio estará sujeto a todos los trámites ulteriores provistos en la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, hasta su resolución final, y todas las partes deberán tener una oportunidad razonable de presentar toda materia pertinente a tal moción bajo dicha regla.

Conforme a ello, el inciso (4) de la Regla 33 del Reglamento Núm. 9321, *supra*, dispone que, luego de analizar los documentos que acompañan la solicitud de orden o resolución sumaria y los documentos incluidos con la moción en oposición, así como aquellos que obren en el expediente de la agencia, sin que sea necesaria la

celebración de una vista adjudicativa, el Oficial Examinador podrá dictar órdenes o resoluciones sumarias. Estas pueden ser de carácter final, o parcial resolviendo cualquier controversia entre las partes, incluyendo determinaciones de hechos y conclusiones de derecho.

Esbozada la norma jurídica, procedemos a aplicarla al recurso ante nos.

**III**

La parte recurrente plantea en su primer señalamiento de error que el Departamento de Salud incidió al emitir una resolución por la vía sumaria en torno a los méritos de la acción de epígrafe sin haberle dado a Alivia la oportunidad de un proceso plenario, en violación al debido proceso de ley. Como segundo error señalado, sostiene que el Departamento de Salud erró al no desestimar la referida acción y, en vez, emitir una orden de cese y desista e imponer una multa en su contra, aun cuando no estableció un "nuevo servicio de salud" ni una "nueva facilidad de salud", según concluyó la agencia recurrida. En su tercer señalamiento de error el Departamento de Salud incidió al penalizarla por utilizar un modelo de servicios que no está prohibido ni vedado en nuestro ordenamiento jurídico, siendo dicha determinación una actuación *ultra vires*. Como cuarto error señalado, arguye que el Departamento de Salud erró al actuar en contra de sus propios actos al no tomar en consideración que ya se había investigado en torno a las mismas violaciones alegadas y no hizo determinación alguna en su contra. En su quinto y último señalamiento de error alega que el Departamento de Salud incidió al imponer multas improcedentes y excesivas. No le asiste la razón.

Un examen sosegado del expediente que nos ocupa mueve nuestro criterio a resolver que no se hacen presentes los criterios legales que legitiman nuestra intervención respecto a lo dispuesto

por el organismo administrativo concernido. A nuestro juicio, la interpretación y aplicación de la Ley Núm. 2-1975, *supra,* así como los Reglamentos Núm. 9321 y 9084, *supra,* por el Departamento de Salud fue una acertada, conforme exige nuestro ordenamiento jurídico. Además, su proceder estuvo dentro de los parámetros de su sana discreción y el debido proceso de ley, conforme al derecho aplicable, por lo que no amerita nuestra intervención.

Según esbozamos, el Reglamento Núm. 9321, *supra,* permite la aplicación de las Reglas de Procedimiento Civil, *supra,* de forma supletoria con el fin de lograr una solución rápida, justa y económica. Esta última, a su vez, permite que una moción de desestimación sea considerada como una solicitud de sentencia sumaria. Cónsono con ello, el mencionado cuerpo reglamentario le da la facultad al Oficial Examinador a desestimar una acción por cualquier otro fundamento que proceda en derecho. Por otro lado, el Reglamento Núm. 9084, *supra,* expresamente dispone que ninguna persona, natural o jurídica, podrá efectuar directamente o por conducto de un agente, mandatario o representante establecer una nueva facilidad de salud o adquirir una facilidad de salud mediante compraventa o de cualquier otro modo sin antes haber obtenido un CNC otorgado por el Secretario o la Secretaria del Departamento de Salud. El mismo reglamento, a su vez, faculta al Secretario o Secretaria a imponer multas administrativas ante la violación de dicha disposición.

En el caso de autos, la agencia recurrida tuvo ante sí una moción de desestimación que esbozaba materias no contenidas en la alegación impugnada, por lo que resolvió sumariamente el asunto luego de colegir que no habían hechos en controversia, pues lo que restaba era aplicar el derecho correspondiente. En cuanto a ello, el Departamento de Salud indicó que no había controversia en que, mediante el modelo de negocios de Alivia con Pavia, se proveían

servicios de salud como los de un programa de servicios de infusión. Luego de un análisis de la Ley Núm. 2-1975, *supra*, así como del Reglamento Núm. 9084, *supra*, el organismo administrativo recurrido concluyó que Alivia y Pavia violentaron el inciso (2) del Artículo IV del Reglamento Núm. 9084, *supra*, el cual prohíbe el establecimiento de una nueva facilidad de salud sin antes haber obtenido un CNC. Resolvió que la prestación de servicios de infusión intravenosa en el hogar mediante el referido modelo de negocios equivalía a que Alivia proveyera servicios de infusión en el hogar por conducto de Pavia sin antes haber obtenido un CNC otorgado por el Secretario del Departamento de Salud, en contravención al citado articulado. Ante ese escenario, colegimos que la parte recurrente incumplió con las disposiciones aplicables, tal y como resolvió la agencia recurrida. Por tanto, la interpretación y aplicación del derecho y reglamentación aplicables del Departamento de Salud no constituye una actuación arbitraria, contrario a lo propuesto por la parte recurrente.

En mérito de lo antes expuesto, sostenemos la determinación agencial recurrida. Nada en el expediente de autos sugiere que el pronunciamiento que atendemos haya resultado de un ejercicio arbitrario atribuible al Departamento de Salud. Por tanto, en ausencia de prueba al contrario, solo podemos sostener su determinación.

**IV**

Por los fundamentos que anteceden, confirmamos el dictamen recurrido.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones